**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Emmitt Thompson, | No. CV-17-01607-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Dignity Health, | |
| Defendant. | |

Plaintiff Emmitt Thompson ("Dr. Thompson") was a second-year medical resident at Barrow Neurological Institute ("BNI").[1] BNI did not renew Dr. Thompson's contract for his third year of residency. Dr. Thompson alleges his residency contract was not renewed due to race discrimination. (Doc. 29.) He also alleges BNI breached its Academic Review Policy and defamed him to the California Medical Board and prospective employers. Before the Court is BNI's Motion for Summary Judgment on Dr. Thompson's claims for race discrimination, defamation, and breach of contract, (Doc. 84), as well as BNI's Motion to Exclude Expert Sandra L. Shefrin (Doc. 86). For the foregoing reasons, BNI's Motion for Summary Judgment (Doc. 84) is granted.[2] BNI's Motion to Exclude Expert Sandra L. Shefrin (Doc. 86) is granted in part and denied in part.

## BACKGROUND

---

[1] Defendant Dignity Health is a California corporation registered and doing business in Maricopa County, Arizona as Barrow Neurological Institute. (Doc. 29 at 2.) To minimize confusion, the Court will refer to Defendant as BNI and the Barrow Adult Neurology Program as "Barrow."

[2] Dr. Thompson's request for oral argument is denied because the issues have been fully briefed and oral argument will not aid the Court's decision.

Emmitt Thompson is an African American doctor.[3] (Doc. 29.) Dr. Thompson declared that he applied to the Barrow Adult Neurology Program ("Barrow") to begin in the 2014–15 academic year. (Doc. 93-1 at 3.) Barrow admitted Dr. Thompson to begin in July 2015, but required Dr. Thompson to complete his first year of residency elsewhere. (Doc. 93-1 at 3.) Dr. Thompson had asked Barrow to consider allowing him to start his first year at Barrow with other members of his class, because he had a documented learning disability that made assimilating written materials a slower process and was concerned about having to catch up with the other residents. (Doc. 93-1 at 3.) Barrow reassured him that he would have time to "get up to speed." (Doc. 93-1 at 3.) Dr. Thompson was the only Adult Neurology resident of his Barrow residency class that was required to complete his first year at a different institution.[4] (Doc. 93-1 at 3.)

Dr. Thompson completed his first year of residency in internal medicine at Meharry Medical College ("Meharry"), a historically African American institution in Nashville, Tennessee. (Docs. 93-1 at 3; 85 at 1.) Dr. Thompson declared he completed his first year at Meharry "with a middle of the class ranking, a strong knowledge base, and the department's blessing to leave the program a few days early." (Doc. 93-1 at 3.) Dr. Richmond Akatuea—Associate Professor of Medicine at Meharry and Program Director of the Internal Medicine Residency—testified that Dr. Thompson "was doing fairly well" at his Meharry residency. (93-1 at 68.) Dr. Akatuea's June 2015 end-of-year evaluation of Dr. Thompson, however, expressed "considerable concern about some aspects of [Dr. Thompson's] professional conduct." (Doc. 93-1 at 71.) It further stated: "Also noted was that you did not always return to work on the days you were required to. As such your attitude to work was unacceptable and unprofessional." (Doc. 93-1 at 71.) In addition, Dr. Thompson received more than one disciplinary email from chief residents at Meharry,

---

[3] Unless otherwise noted, factual statements included in the Court's summary are undisputed.
[4] Dr. Suraj Muley testified the six other residents all began their first year at Barrow. (Doc. 93-2 at 3.)

warning him of a "no call, no show" violation and "a pattern of uncooperative work ethics in this academic year." (Doc. 85-1 at 99–101.)

In May 2015, Dr. Thompson signed a Postgraduate Training Agreement with BNI (the "Agreement"). (Docs. 93-1 at 3; 85-1 at 104.) The Agreement appointed Dr. Thompson as a second-year resident in the Barrow Adult Neurology program, from July 1, 2015 until June 30, 2016. (Doc. 85-1 at 105.) The Agreement provided: "Resident's re-appointment to the next postgraduate training year shall be by recommendation from the Program Director and shall be contingent upon the Resident's successful completion of the current postgraduate year of education." (Doc. 85-1 at 105.) In addition, the Agreement stated: "In the event the Resident fails to satisfactorily perform [his] duties and obligations . . . Hospital may terminate this Agreement at any time. The Program Director, in consultation with the Directors of Academic Affairs and Human Resources, shall notify Resident of such action in writing." (Doc. 85-1 at 114.) If a resident's contract is not renewed, he may appeal the decision in accordance with the Academic Review and Appeals Process Policy ("Academic Review Policy"). (Doc. 85 at 2.) The Academic Review Policy describes the process of appeal: First, the resident must attempt to resolve the issue with his immediate supervisor. If the immediate supervisor is involved in the event or issue, the resident may submit a written statement to his program director about the unresolved issue and the resolution he seeks. If the program director is the immediate supervisor, the resident must submit the statement to the Designated Institutional Official ("DIO") within five days after meeting with the immediate supervisor. (Doc. 85-1 at 117.) At Barrow, Dr. Thompson had various immediate supervisors, depending on his training block or rotation. Dr. Suraj Muley was the program director and Dr. Jeffrey Sugimoto was the DIO. Dr. Thompson was the only African American in his class of seven, although there were African American residents in the classes above and below him. (Doc. 85 at 10.)

Dr. Thompson admitted he encountered difficulties during his first months as a resident at Barrow. Dr. Thompson declared his "early difficulties at Barrow can be

explained by the difference in program style between Meharry and Barrow." (Doc. 93-1 at 4.) Unlike everyone else in his class, Dr. Thompson had not spent his first year of residency at Barrow. As a result, Dr. Thompson had to use "mental space" to learn systems and layouts that were specific to Barrow. (Doc. 85-1 at 17.) In addition, Dr. Thompson testified that compared to Meharry, Barrow "had more electives in neurology as well as teaching from senior residents. And there's a neurology program at Barrow that there isn't . . . at Meharry." (Doc. 85-1 at 60.)

The Barrow program "is broken down into 13 training blocks or rotations, during which residents shadow and work with attending physicians." (Doc. 85-1 at 132.) The attending physician evaluates the residents for their performance during each block. Despite some favorable feedback, Dr. Thompson received significant negative evaluations from multiple attending physicians. Below are examples of the negative evaluations of Dr. Thompson's performance from July until December 2015:

- Dr. Kerry Knievel, in evaluating Dr. Thompson's Block 2 rotation, wrote that Dr. Thompson was "[d[isorganized and [had] a difficult time completing his work. He is unable to keep track of the details about patient history and has trouble identifying sick patients." (Doc. 85-1 at 136.)

- Dr. David Treiman, in evaluating Dr. Thompson's Block 3 rotation, wrote: "Fund of knowledge weaker than peers. Needs significant improvement. On the other hand, professional appearance is superior to most of his peers." (Doc. 85-1 at 138.)

- Dr. Joni Clark, in evaluating Dr. Thompson's Block 4 rotation, wrote: "Knowledge base and management, diagnostic skills less than level of training. Can be improved with continued training and reading." (Doc. 85-1 at 140.)

- Dr. Aimee Borazanci, in evaluating Dr. Thompson's Block 6 rotation, wrote: "[Dr. Thompson] seemed pre-occupied during this rotation. Medical knowledge was lacking. He had difficulty formulating appropriate assessments & plans." (Doc. 85-1 at 142.)

On December 17, 2015, Dr. Thompson received written discipline after he failed to

report for his on-call shift and was unavailable for three hours. (Doc. 85 at 4.) During deposition, Dr. Thompson admitted this incident occurred but noted his three-hour absence did not endanger patients because there was another resident on call. (Doc. 85-1 at 33–36.) On December 23, 2015, Dr. Thompson received another written discipline: "Dr. Emmitt Thompson neglected to add patients he had seen on call to the inpatient census, resulting in patients not being followed appropriately. No harm came to the patients. Also was noted that he was not returning calls to the transfer center in a timely fashion." (Doc. 85-1 at 178.) After that, Dr. Courtney Schusse[5] had a conversation with Dr. Thompson and told him that additional performance problems could lead to termination. (Doc. 85-1 at 39.) On January 28, 2016, Dr. Thompson received written discipline once again. This time, three problems were identified: "1. Did not appropriately enter admission orders for an acute stroke patient; 2. Concern that he did not respond to the RN call regarding a patient in status epilepticus . . . 3. Concerns raised by the neurosurgical service of difficulty communicating with him regarding patient care on several occasions[.]" (Doc. 85-1 at 180.)

Following this incident, program director Dr. Muley and Dr. Schusse met with Dr. Thompson to inform him that BNI would not be renewing its contract with him for the next academic year. Dr. Thompson appealed the nonrenewal decision to Dr. Sugimoto, stating: "To my understanding this [nonrenewal] decision was made on the basis of 2 human errors and a mistake coupled with the perception of a general sense of lack of urgency and insufficient knowledge on my part." (Doc. 85-1 at 182.) Dr. Thompson further stated: "I can't dispute that I've made some errors, but I would argue that I've taken steps to prevent similar oversights in the future." (Doc. 85-1 at 182.) According to Dr. Thompson, he had a hard time adjusting to Barrow and "was finding it hard to be motivated and generally had low energy" from October until December 2015. (Doc. 85-1 at 183.)

While his appeal was pending, Dr. Thompson continued to experience issues related to his work performance. During this time, Dr. Muley asked attending physicians for

---

[5] Dr. Schusse is the current program director of the neurology residency program, although she did not appear to be program director at the time.

additional feedback on Dr. Thompson, because Dr. Muley "wanted perspective from different attendings about him, and to get a more balanced kind of view of his skills." (Doc. 93-2 at 16.)

- On February 8, 2016, Dr. Holly Shill emailed Dr. Schusse and Dr. Muley with a report of her experience working with Dr. Thompson since January 2016. Dr. Shill described multiple incidents, summarizing: "I worry about his ability to synthesize information and be alert to potentially serious neurological issues. In just about every patient we have seen together, he fails to put the symptoms together to come up with a potential diagnosis. He misses pertinent information in the medical records and often fails to include key items in his own notes." (Doc. 85-1 at 146–47.)

- On February 15, 2016, Dr. Kamala Saha emailed Dr. Muley with a description of issues she had while working with Dr. Thompson. She wrote: "I generally feel that he struggles to keep up with his peers in his same year and his overall capabilities as a resident are limited." (Doc. 85-1 at 198.) She further noted: "He forgets lots of things regarding patients in terms of results, history, etc. . . . I have to double check everything he does and look up all the results myself and all the orders because I simply cannot trust him. He makes errors and tells me that tests were canceled when I already am aware that they were not and the results are back. I cannot count on him to be reliable when it comes to patients." (Doc. 85-1 at 198.)

Nevertheless, BNI reconsidered Dr. Thompson's contract nonrenewal decision and instead presented him with a Performance Improvement Plan ("PIP") on March 22, 2016. (Docs. 85 at 6; 85-1 at 201.) The PIP identified four areas in which Dr. Thompson needed improvement: medical knowledge, patient care, professionalism, and practice-based learning and improvement. (Doc. 85-1 at 201–02.) Dr. Thompson agreed to additional reading assignments and quizzes, as well as closer supervision by Drs. Schusse and Muley. (Doc. 85-1 at 202.) Furthermore, the PIP modified Dr. Thompson's schedule of assignments and left May unset and contingent on his performance. (Doc. 85-1 at 202.)

The PIP noted: "Immediate and sustained improvement is required. Failure to improve or sustain improvements will be considered cause for further disciplinary action, up to and including non-renewal of contract or dismissal." (Doc. 85-1 at 202.)

After implementation of the PIP, Dr. Thompson continued to receive criticism for his work performance.

- On April 7, 2016, Dr. Erik Ortega wrote: "[Dr. Thompson's] HIP is meandering, tangential and unfocused. His examination is unreliable and does not necessarily focus on the consultative concerns that resulted in his evaluation of the patient. His assessment and plan, perhaps unsurprisingly, is lacking in that there actually may be no true assessment[.]" (Doc. 85-1 at 151.)

- On April 18, 2016, Dr. Saha reported that Dr. Thompson had failed to write a history and physical ("H&P") for a patient he recently saw. (Doc. 85-1 at 206.)

- On April 28, 2016, Dr. Shafeeq Ladha wrote: "I recently saw a patient in the clinic with [Dr. Thompson] . . . . I found that his history was quite inaccurate and, more importantly, was not directed towards the obvious differential." (Doc. 85-1 at 149.)

- On May 4, 2016, Dr. Terry Fife wrote: Dr. Thompson "comes off as lacking emotional energy or the ability to muster a sense of urgency when needed. He is trying but it is hard to tell how much. When he is on call and short on time, he doesn't get to review the patient's charts as thoroughly and sometimes forgets what is going on with results." (Doc. 85-1 at 153.)

On May 12, 2016, the Clinical Competency Committee—a group of faculty members at Barrow—met to discuss Dr. Thompson's situation.[6] It decided "Dr. Thompson's contract for progression will not be renewed for 2016–2017." (Doc. 185-1 at 212.) Drs. Muley and Schusse met with and notified Dr. Thompson of the nonrenewal decision on May 31, 2016 and BNI paid him through June 30, 2016—the end of his contract term. (Doc. 85 at 9.)

---

[6] According to the Minutes, fifteen doctors were present at the meeting, including Drs. Muley and Schusse. (Doc. 185-1 at 212.)

Dr. Thompson formally appealed the nonrenewal decision to Dr. Sugimoto on June 9, 2016. In his appeal, Dr. Thompson stated: "If asked what I think has been most relevant to my current situation, I'd have to answer bias." (Doc. 85-1 at 226.) Dr. Thompson specifically named three attending physicians to support his complaint of bias: Drs. Clark, Knievel, and Saha. Dr. Clark, according to Dr. Thompson, intentionally set him up by asking questions "which were preludes to an opportunity for her to berate" him. (Doc. 85-1 at 226.) Drs. Knievel and Saha "exaggerat[ed] [his] shortcomings while minimizing the same in others." (Doc. 85-1 at 227.) Dr. Thompson admitted he was "behind [his] peers" when he first met Drs. Knievel and Saha. However, Dr. Thompson stated they continued to "presume" that he did not know what he was doing in later interactions. (Doc. 85-1 at 227.) Dr. Sugimoto denied Dr. Thompson's appeal as untimely. (Doc. 85 at 9.)

Dr. Thompson subsequently left Barrow and applied for a California medical license. In connection with its review of the application, the California Medical Board asked BNI to fill out a Certification of Completion of ACGME/RCPSC Postgraduate Training ("Certificate"). (Doc. 85 at 9.) On the Certificate, Dr. Muley marked the box indicating that Dr. Thompson was "terminated, dismissed or expelled" from Barrow, as well as the box indicating Dr. Thompson was placed on probation as a resident. (Doc. 85-1 at 231.)

Dr. Thompson sued BNI, alleging race discrimination under Title VII and § 1981, breach of contract, and defamation. BNI moved for summary judgment on all claims. (Doc. 84.)

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In reviewing a motion for

summary judgment, all evidence must be construed in the light most favorable to the non-moving party.

**ANALYSIS**

**I.    Motion to Exclude Expert Sandra L. Shefrin**

Before turning to BNI's Motion for Summary Judgment, the Court first addresses BNI's Motion to Exclude Expert Sandra L. Shefrin (Doc. 86.)  Although BNI styles its motion as a motion to exclude, the Court considers it as an objection to admission of evidence at summary judgment.

After reviewing Dr. Shefrin's expert report and deposition testimony, the Court concludes most of Dr. Shefrin's opinions are inadmissible because they are based on speculation rather than facts or data.  Further, although Dr. Shefrin is an expert in neurology and claims to "explain the medicine," her opinions primarily concern medical education and personnel decisions—topics that are not within her area of expertise.  (Doc. 91 at 2.)

Expert testimony must rest on a "reliable foundation" and methodology.  *United States v. Hermanek*, 289 F.3d 1076, 1092 (9th Cir. 2002) (citation omitted).  An expert's "general qualifications" are insufficient.  *Id.*  Dr. Shefrin's opinions overwhelmingly lack reliable foundation and methodology, and many of her opinions lack any foundation at all.  Below are examples of Dr. Shefrin's opinions that are based on her own assumptions and speculation rather than facts or data:

- Dr. Shefrin wrote: "I would *suspect* that many, if not most of [Dr. Thompson's] patients were adequately written up and managed."  (Doc. 86-1 at 65 (emphasis added).)  When asked about this during deposition, Dr. Shefrin testified she based her assumption on her personal experience as a resident more than thirty years ago, when supervisors generally did not say "[g]ood job" when work was done adequately and silence was often interpreted to mean that nothing was remiss.  (Doc. 86-1 at 41.)

- Dr. Shefrin wrote: "Dr. Thompson likely has superior problem solving abilities" and "I suspect that once Dr. Thompson would have improved his knowledge base, that

- 9 -

his ability to assimilate and synthesize information would have been excellent." (Doc. 86-1 at 67.)  Dr. Shefrin testified she never met Dr. Thompson nor observed him solving problems, and that she based her opinion on interactions with colleagues who had the same undergraduate major as Dr. Thompson.  (Doc. 86-1 at 53.)

- Dr. Shefrin wrote: "Perhaps Dr. Thompson was simply 'not a fit' for Barrow.  His evaluations indicated that he was affable and presented himself well to both patients and staff.  Therefore, his interpersonal and communication skills seemed not to have been a problem."  (Doc. 86-1 at 68.)  When asked about the basis of her opinion, Dr. Shefrin admitted "[t]hey are speculations."  (Doc. 86-1 at 56.)  When asked if her speculations were based on any facts, she simply answered "No."  (Doc. 86-1 at 56.)

- Dr. Shefrin opined "[p]erhaps there were other biases" involved when BNI did not renew Dr. Thompson's contract.  (Doc. 86-1 at 68.)  When asked what she meant by "biases," she answered "[n]othing in particular" and "I don't know."  (Doc. 86-1 at 57.)  Dr. Shefrin further testified she did not review anything suggesting biases against Dr. Thompson.  (Doc. 86-1 at 57.)

In addition to lacking foundation, Dr. Shefrin's expert opinions primarily concern BNI's decisions about resident discipline and the reasonableness of contract nonrenewal—topics that are outside of her area of expertise and her stated role to "explain the medicine." (Doc. 91 at 2.)  Dr. Shefrin's expertise in neurology does not qualify her to offer expert opinion regarding BNI's decisions concerning graduate medical education.  *See Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 213 (D. Mass. 2009).

During deposition, Dr. Shefrin testified she does not know—nor has she ever reviewed in a professional capacity—the national requirements and standards that the Accreditation Counsel for Graduate Medical Education ("ACGME") imposes on residents. (Doc. 86-1 at 25–26.)  Nor has Dr. Shefrin reviewed ACGME guidelines on resident discipline.  (Doc. 86-1 at 28.)  Dr. Shefrin also did not review any records regarding BNI's

neurology residency program or its standards, aside from an online search of its residents. (Doc. 86-1 at 9–10, 37.) Because Dr. Shefrin admitted she is unfamiliar with the standards and requirements for neurology residents, her opinions concerning BNI's personnel decisions about residents, BNI's decisions on graduate medical education, and the reasonableness of resident contract nonrenewal are not considered on summary judgment.

Dr. Shefrin's expert opinion shall be allowed only to the extent they explain the medicine. The Court has identified only one portion of her expert report that is admissible: Dr. Shefrin's opinion on whether Dr. Clark appropriately criticized Dr. Thompson for admitting a patient with Parkinson's disease to the stroke service.[7] (Doc. 86-1 at 64.) Thus, the Court shall consider only this portion of Dr. Shefrin's expert report on summary judgment.

## II. Race Discrimination

Dr. Thompson brought claims for race discrimination under Title VII and 42 U.S.C. § 1981. (Doc. 29.) Under both statutes, an employer is liable if it "subjects an employee to disparate treatment." *Reynaga v. Roseburg Forest Prods*, 847 F.3d 678, 690 (9th Cir. 2017). To show a prima facie case of disparate treatment, a plaintiff must show: (1) he belongs to a protected class, (2) he was performing according to the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably. *Id.* at 690-91. If the plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. If the employer meets this burden, the plaintiff must then show that the reason offered by the employer was a pretext for discrimination.[8]

---

[7] Dr. Shefrin also criticizes an evaluation of Dr. Thompson's purported misdiagnosis of a patient's visual symptoms. (Doc. 86-1 at 66–67.) While this portion of the expert report explains the medicine, Dr. Shefrin wrote she did not know the details of that particular case. (Doc. 86-1 at 66.) Thus, this opinion shall not be considered because it lacks foundation.

[8] This burden-shifting framework is one way to evaluate disparate treatment claims. "In the alternative, a plaintiff may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason 'more likely than not motivated' the employer." *Reynaga*, 847 F.3d at 691. The plaintiff may choose which framework to use when responding to a summary judgment motion. *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004). Here, Dr. Thompson's Response employs the burden-shifting network. (Doc. 84 at 7.)

*Id.* at 691.  Here, Dr. Thompson's race discrimination claims fail as a matter of law because he can neither establish a prima facie case of disparate treatment nor show that BNI's proffered reason was pretext.

The undisputed evidence in the record shows Dr. Thompson was not performing his work according to BNI's legitimate expectations.  *See Ingram v. Pac. Gas & Elec. Co.*, 690 Fed. Appx. 527, 529 (9th Cir. 2017) (holding that plaintiff electrician failed to perform his job satisfactorily when he committed multiple errors and violated employer's policies).  The Ninth Circuit has instructed that for disparate treatment claims, "[t]he requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence."  *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1094 (9th Cir. 2005) (citations omitted).  At the prima facie stage, an employee's "self-assessment of his performance is relevant."  *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 660 (9th Cir. 2002).

Even under this low standard, however, Dr. Thompson has not shown that he satisfactorily performed his job according to the legitimate expectations of BNI.  During Dr. Thompson's 10-month tenure at Barrow, he received contemporaneously written negative feedback from approximately a dozen supervising doctors: Dr. Knievel, Dr. Treiman, Dr. Clark, Dr. Borazanci, Dr. Varma, Dr. Muley, Dr. Shill, Dr. Saha, Dr. Ortega, Dr.Ladha, and Dr. Fife.  These doctors expressed a number of concerns about Dr. Thompson's work performance, including his lack of reliability, focus, accuracy, sense of urgency, medical knowledge, diagnostic skills, and organization.  *Cf. Aragon*, 292 F.3d at 659 (holding that plaintiff employee in waste disposal industry established prima facie case of race discrimination when there were no formal write-ups for poor performance and his trucks brought in an average amount of garbage by weight).

During his deposition, Dr. Thompson was asked about his supervisors' negative evaluations. Notably, Dr. Thompson admitted to many of the mistakes and deficiencies described by his supervisors.  For example, Dr. Thompson admitted he was three hours late

in reporting to a shift and was unavailable by phone or pager during those three hours.[9] (Doc. 85-1 at 33–34.) When asked about Dr. Borazanci's assessment that his "medical knowledge was lacking," Dr. Thompson answered: "I mean, it's based on her expectation and her area of expertise, so was I lacking in her area of expertise? I would certainly—I mean, I certainly could have used more—I could have known more." (Doc. 85-1 at 30.) And when asked about Dr. Saha's criticism that "[h]e forgets lots of things regarding patients in terms of . . . results, history," Dr. Thompson admitted to "an incident where [Dr. Saha] had asked if [Dr. Thompson] saw a patient and [he] couldn't remember seeing that patient." (Doc. 85-1 at 65–66.) Dr. Thompson further admitted he understood why Dr. Saha was concerned by his memory issues regarding the patient. (Doc. 85-1 at 66.)

Dr. Thompson appears to argue that despite his mistakes, he was performing satisfactorily. To support this, Dr. Thompson relies primarily on his own Declaration and deposition testimony. While Dr. Thompson's self-assessment of his performance is relevant at the prima facie stage, no reasonable juror would find that he performed his job satisfactorily from the evidence in the record. Dr. Thompson offers nine facts in support of his argument that he performed his job satisfactorily. The Court addresses each one in turn.

1. Dr. Thompson states that before putting him on the PIP, Barrow offered him credit for the full year, which shows that he performed satisfactorily. (Doc. 92 at 10.) In support, Dr. Thompson cites an "action plan" that was presented to him in January 2016, which gave him the option of contract nonrenewal, eligibility to receive credit, and removal from all call duties for the remainder of the academic year. (Doc. 93-1 at 45.) That Dr. Thompson was eligible to receive credit—while also being informed that his contract would not be renewed and he would be removed from all call duties—does not indicate he performed satisfactorily. Notably, the action plan did not offer Dr. Thompson full credit as he claims; rather it merely stated he was

---

[9] Dr. Thompson noted that in that instance, there was no danger to the patient because another resident was also on call. However, Dr. Thompson admitted a resident's failure to show up could result in patient safety issues. (Doc. 85-1 at 35–36.)

1    eligible for credit.

2    2.   Dr. Thompson states Dr. Muley wrote him a recommendation that stated he would

3         be an "excellent candidate." (Doc. 92 at 10.) The Court has reviewed this document

4         and it does not state that Dr. Thompson would be an "excellent candidate." Dr.

5         Muley wrote: "Emmitt is extremely hard working and would stay long hours taking

6         care of his ward duties including inpatient notes and orders. He is a team player and

7         has good interpersonal skills. He is in the process of developing a knowledge base

8         in neurology that will allow him to practice neurology more effectively. The

9         Barrow Neurological Institute is known for an extremely high volume of patients

10        both in the ER setting and in the wards. Our program is therefore not the perfect fit

11        for Emmitt's skill set." (Doc. 93-2 at 57.) That Dr. Thompson worked hard and

12        was a team player does not mean he performed his work satisfactorily under

13        Barrow's standards.

14   3.   Dr. Thompson states he performed better than at least two of his peers on the US

15        RITE exam, citing his own deposition testimony. (Doc. 92 at 10.) During

16        deposition, however, Dr. Thompson testified that he *believed*—but did not know for

17        a fact—that he outperformed two classmates, and did not know their actual scores.

18        (Doc. 93-1 at 33.) This evidence is inadmissible because it is Dr. Thompson's

19        opinion rather than fact.

20   4.   Dr. Thompson states he performed well on his PIP and received good marks on

21        quizzes. (Doc. 92 at 10.) In support, Dr. Thompson cites his own Declaration,

22        which states: "I applied myself to the PIP and completed all but one of the weekly

23        reading assignments on time." (Doc. 93-1 at 6.) During deposition, Dr. Thompson

24        admitted to missing three of four questions on one quiz and missing three of five

25        questions on another. (Doc. 85-1 at 196, 202.) There is no indication that his

26        supervisors viewed these scores as "good marks."

27   5.   Dr. Thompson states without citation that there were no more serious complaints

28        about him after he started the PIP. (Doc. 92 at 10.) As noted above, the Court is

aware of at least several serious complaints about Dr. Thompson after he started the PIP.

6. Dr. Thompson states that BNI "has no evidence that anyone else was ever seriously disciplined for the things Dr. Thompson did." (Doc. 92 at 10.) The burden is on Dr. Thompson, not BNI, and Dr. Thompson has not cited evidence supporting this statement.[10]

7. Dr. Thompson states Dr. Shefrin will offer expert testimony regarding the criticisms of his performance. (Doc. 92 at 11.) Dr. Shefrin's expert opinion is addressed above. Even assuming Dr. Shefrin's opinion is entirely admissible, her ultimate conclusion was that given Dr. Thompson's performance at Barrow, "it would have been reasonable for Barrow to allow Dr. Thompson to repeat his [second] year. At a minimum, they could have helped him to gain entrance into a program that was less rigorous than theirs." (Doc. 86-1 at 68.) This opinion indicates Dr. Thompson's performance was not sufficiently satisfactory to allow him to continue onto his third year of residency at Barrow.

8. Dr. Thompson states his supervisors did not report him to the State of Arizona; therefore, his performance was not poor enough to be reportable. (Doc. 92 at 11.) The State of Arizona requires doctors to be reported if they are "medically incompetent," "guilty of unprofessional conduct," or "mentally or unable to safely engage in the practice of medicine." (Doc. 93-2 at 51.) Dr. Thompson's work performance did not have to be reportable in order to be unsatisfactory according to his employer's expectations.

9. Dr. Thompson states his peers thought he was performing well, citing the deposition testimony of Dr. William Jacobsen—one of his fellow residents. (Doc. 92 at 11.) This statement misrepresents Dr. Jacobsen's testimony: "There was a general

---

[10] Dr. Thompson states other residents made mistakes such as being tardy or failing to enter orders. However, he has not identified any other residents whose mistakes were of comparable severity and frequency to his own. Moreover, Dr. Thompson fails to consider that it was not one or two mistakes, but—as the record shows—the combination of many mistakes and supervisors' consistent concerns about his job performance, that led to his contract nonrenewal.

consensus that there were some things that [Dr. Thompson] was doing that were concerning," although "he was working hard, and I liked working with him, he's a very nice guy." (Doc.93-2 at 70.)

In any event, Dr. Thompson cannot establish that BNI's stated reason for his nonrenewal—Dr. Thompson's documented poor performance—was pretext for race discrimination. Dr. Thompson has not alleged "direct evidence" of race discrimination, including clearly "racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005). Thus, Dr. Thompson must show pretext using "circumstantial evidence." *Coghlan*, 413 F.3d at 1095. Circumstantial evidence of pretext must be "'specific and substantial" to "show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Goodwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998) (citation omitted).

Dr. Thompson states BNI's proffered reason was pretext because he received criticism from supervisors despite his belief that he performed satisfactorily, therefore "the only explanation . . . is that [Dr. Thompson] was the only black resident there." (Doc. 92 at 2.) This is insufficient to show pretext. As noted above, BNI presented evidence of contemporaneous evaluations written by a dozen or so supervisors. In Response, Dr. Thompson argues their criticism was unfair and inappropriate. During deposition, however, Dr. Thompson admitted that most of these supervisors did *not* discriminate against him on the basis of race. (Doc. 85-1 at 31, 42, 63, 84, 85, 87.) For example, when Dr. Thompson was asked about Dr. Shill's concern that he had trouble synthesizing information, he testified her evaluation of him would have been the same if he were white. (Doc. 85-1 at 63.) Indeed, Dr. Thompson alleges that Drs. Clark, Saha, and Knievel were the only supervising doctors who wrote negative evaluations about him because they were discriminating against him on the basis of race, although he offers scant evidence other than his own testimony about a general sense of unfair treatment, which is merely an

inadmissible opinion.[11]  (Docs. 85 at 9; 93 at 10.)  Dr. Thompson suggests the other supervisors—although they did not discriminate against him—based their poor performance evaluations on their own inexperience or peer pressure from their colleagues, but again, offers no admissible evidence to support this claim.

Thus, summary judgment with regard to the discrimination claims is granted.

**III.   Defamation**

In his Amended Complaint, Dr. Thompson alleges BNI made defamatory statements about him to prospective employer Banner Health and the California Medical Board.  (Docs. 29 at 9; 93 at 8.)  In his Response, however, Dr. Thompson did not address BNI's argument that there is no evidence indicating BNI made *any* statements about him to prospective employers.  The Court has not identified any evidence indicating that BNI made statements about Dr. Thompson to Banner Health or any prospective employers and shall consider only the allegedly defamatory statements made to the California Medical Board.[12]

Dr. Thompson alleges Dr. Muley made defamatory remarks to the California Medical Board when he answered "yes" to the following two questions: (1) "Was the applicant ever terminated, dismissed or expelled?"; (2) "Was the application ever placed on probation?"  (Doc. 85-1 at 242.)  According to Dr. Thompson, these remarks were false because his contract nonrenewal did not constitute a termination and his Performance Improvement Plan did not constitute probation.  (Doc. 92 at 16–17.)

To state a claim for defamation, a plaintiff must show the defendant (1) made a false statement; (2) published it to a third party; and (3) either knew the statement was false, or acted negligently or recklessly in disregard of the truth.  *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 316 (Ariz. 1977).  "Substantial truth is an absolute defense to a

---

[11] The Court considers Dr. Shefrin's expert opinion on the reasonableness of one of Dr. Thompson's evaluations.  Even viewed in the light most favorable to Dr. Thompson, evidence in the record is insufficient to establish pretext.  And as noted above, even if Dr. Shefrin's opinions were entirely admissible, she ultimately concluded that Dr. Thompson's performance warranted a repeat of his second year of residency.

[12] When asked whether Barrow had said anything to prospective employer Banner about him, Dr. Thompson admitted: "[W]hether things were said or not . . . I don't know."  (Doc. 85-1 at 109.)

defamation action in Arizona." *Read v. Phoenix Newspapers, Inc.*, 169 Ariz. 353, 355 (Ariz. 1991).

Here, the undisputed evidence shows that Dr. Muley's statements to the California Medical Board were substantially true. "Slight inaccuracies will not prevent a statement from being true in substance, as long as the 'gist' or 'sting' of the publication is justified." *Id.* (citations omitted). In *Fendler v. Phoenix Newspapers, Inc.*, for example, plaintiff Fendler sued the defendant newspaper over an allegedly false statement published in the Arizona Republic stating "Fendler is doing four-to-five years in prison because of his fraudulent practices." 130 Ariz. 475, 477 (Ariz. Ct. App. 1981). The court found the article "incorrectly stat[ed] that [Fendler] had commenced serving his sentence" because Fendler had posted bond and was not in prison as of the date the article was published. *Id.* at 480. Despite this incorrect information, the court concluded "the inaccuracy in the editorial was not significant" and "the substantial 'sting' is the same, whether he had started his prison term or will never actually spend time in prison." *Id.*

Similarly, Dr. Muley's statements about Dr. Thompson were substantially true, even assuming they contained technical inaccuracies. Dr. Thompson argues BNI did not "terminate, dismiss, or expel" him because there is a difference between contract nonrenewal and termination, dismissal, or expulsion. (Docs. 92 at 17; 93-1 at 74.) However, in addition to his contract not being renewed for the third year, Dr. Thompson also did not complete his second year at Barrow. There is no dispute that although BNI paid Dr. Thompson through the end of his contract, Dr. Thompson did not receive credit for the year he did not complete. Pursuant to the PIP, Dr. Thompson's later rotations were not set because they were to be "[d]etermined based on performance." (Doc. 85-1 at 202.) After the Clinical Competency Committee decided Dr. Thompson's performance was not sufficiently satisfactory, he did not complete the remainder of his second year. Indeed, as BNI points out, Dr. Thompson considered himself terminated and based his Complaint in the present litigation on being unlawfully "terminated" by BNI. (Doc. 29 at 7.) Regardless

of whether Dr. Thompson was technically terminated, dismissed, or expelled, the substantial "sting" of Dr. Muley's statements was the same.

Dr. Muley's statement indicating Dr. Thompson was placed on probation was also substantially true. There is no dispute that Dr. Thompson was placed on a Performance Improvement Plan designed to "clearly elucidate the issues that have been identified with the performance of [Dr. Thompson] and to outline the remediation steps necessary to address issues of concern." (Doc. 85-1 at 201.) The PIP put Dr. Thompson on a modified schedule with closer supervision by Drs. Schusse and Muley, and explicitly warned that failure to improve in accordance with the PIP "will be considered cause for further disciplinary action." (Doc. 85-1 at 202.) In addition, the PIP did not set Dr. Thompson's schedule for the end of the academic year because his future duties were contingent on his compliance with the PIP. (Doc. 85-1 at 202.) These facts indicate Dr. Thompson was on probationary status, even if he was not on technical probation as defined by the ACGME. As such, summary judgment with regard to the defamation claim is granted.

## IV. Breach of Contract

Dr. Thompson alleges BNI breached (1) the Agreement through nonrenewal of his residency contract; and (2) the Academic Review Policy that governed his appeal to Dr. Sugimoto. The undisputed evidence shows BNI breached neither the Agreement nor the Academic Review Policy.

"Interpretation of a contract is a question of law for the court where the terms of a contract are found to be plain and unambiguous." *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 175 Ariz. 273, 277 (Ariz. Ct. App. 1993). Here, the terms of both agreements are plain and unambiguous. The Agreement provides:

"Resident's re-appointment to the next postgraduate training year shall be by recommendation from the Program Director and shall be contingent upon the Resident's successful completion of the current postgraduate year of education . . . . In the event Resident receives re-appointment to the next postgraduate training

year from the Program Director . . . Hospital may, in its sole discretion, renew the Agreement[.]" (Doc. 85-1 at 105.)

It is undisputed Dr. Thompson did not receive a recommendation from his program director, Dr. Muley, or successfully complete his year at Barrow. As such, under the plain terms of the contract, BNI did not breach the Agreement in declining to reappoint Dr. Thompson and renew his contract.[13]

With regard to BNI's alleged breach of the Academic Review Policy, Dr. Thompson argues Dr. Sugimoto's denial of his appeal as untimely—without considering its merits—violated the Academic Review Policy. Dr. Thompson argues there is a factual dispute as to whether his appeal was timely under the Academic Review Policy. (Doc. 92 at 15.)

The Academic Review Policy specifically sets out requirements on the process of appeals: "Professional and academic concerns should first be taken up between the resident and his or her immediate supervisor. If the resident's immediate supervisor is involved in the event or issue, the resident may then proceed directly to the next step." (Doc. 85-1 at 117.) The next step is: "If no satisfactory settlement is reached above, the resident may state in writing the reasons why the matter remains unresolved and what resolution the resident is seeking. The resident shall submit the writing described above to his/her program director. If the program director is the immediate supervisor, the resident may submit the written statement to the DIO. If the resident does not submit the written statement within five (5) calendar days after the meeting with their immediate supervisor as described in [Step One], the program director or DIO are not required to respond and no further review rights are available." (Doc. 85-1 at 117.)

Here, Dr. Thompson met with Drs. Muley and Schusse on May 31, 2016. Drs. Muley and Schusse notified Dr. Thompson of the Clinical Competency Committee's decision to not renew his contract. (Doc. 9301 at 6–7.) During this meeting, Dr. Thompson

_____

[13] In his Response, Dr. Thompson appears to argue that BNI did not have "sole discretion" to renew—as stated in the Agreement—because it provided a process by which residents could appeal nonrenewal decisions. (Doc. 92 at 15.) This argument is incorrect. The existence of an appeals process does not show that the initial nonrenewal decision was non-discretionary.

"told them [he] would appeal." (Doc. 93-1 at 7.) Because the nonrenewal decision involved his immediate supervisor and program director—Dr. Muley—Dr. Thompson submitted his appeal directly to DIO Dr. Sugimoto. Under the Academic Review Policy, Dr. Thompson had five days—until June 4, 2016—to timely submit his written appeal.[14] Dr. Thompson's letter to Dr. Sugimoto was submitted on June 9, 2016, five days after the deadline for appeal.

Accordingly,

**IT IS ORDERED** Defendant's Motion for Summary Judgment (Doc. 84) is **GRANTED**.

**IT IS FURTHER ORDERED** Defendant's Motion to Exclude Expert Sandra L. Shefrin (Doc. 86) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** the Clerk of Court shall enter judgment against Plaintiff.

Dated this 5th day of March, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge

---

[14] Defendant argues there is a factual dispute over whether another meeting happened between Drs. Thompson, Muley, and Schusse on June 6, 2016. (Doc. 92 at 15.) This fact is irrelevant under the Academic Review Policy, as Dr. Muley was Dr. Thompson's immediate supervisor and they had already met on May 31, 2016.