**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Emmitt Thompson,<br><br>    Plaintiff,<br><br>v.<br><br>Dignity Health,<br><br>    Defendant. | No. CV-17-01607-PHX-ROS<br><br>**ORDER** |

Plaintiff Dr. Emmitt Thompson ("Dr. Thompson") was a medical resident at Defendant Dignity Health's Barrow Neurological Institute ("Dignity") for the 2015–2016 academic year. Throughout the year, Dr. Thompson experienced employment difficulties, including being subject to discipline. Dr. Thompson was not, however, placed on formal probation. At the end of the year, Dr. Thompson's contract was not renewed. After leaving Dignity, Dr. Thomson applied for a California medical license. As part of the application process, Dr. Suraj Muley, the Program Director at Dignity, filled out a Certificate of Completion. On the Certificate, Dr. Muley indicated Dr. Thompson had been placed on probation and terminated, dismissed, or expelled. Dr. Thompson alleges these statements defamed him and delayed his licensure in California. Dignity now moves for summary judgment on Dr. Thompson's defamation claim. For the reasons below, Dignity's motion will be denied.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. In May 2015, Dr.

Thompson entered a contract to be a resident at Dignity for the 2015–2016 academic year. (Doc. 130 at 1). At the end of the contract term, he could be reappointed as a resident if he successfully completed the year and his Program Director recommended. (Doc. 130 at 1). The contract allowed Dignity to terminate Dr. Thompson "at any time" if he did not satisfactorily perform his duties and obligations. (Doc. 130 at 1).

During his year at Dignity, Dr. Thompson experienced problems. Between December 2015 and January 2016, Dr. Thompson received written discipline three times. (Doc. 130 at 1). At the end of January 2016, Dr. Thompson's supervisors informed him that his contract would not be renewed at the end of the academic year. (Doc. 130 at 1–2). But after Dr. Thompson appealed, Dignity reduced the nonrenewal decision to a performance improvement plan ("PIP") effective March 22, 2016. (Doc. 130 at 2). Through the PIP, Dr. Thompson agreed to take certain measures to improve in four areas (medical knowledge, patient care, professionalism, and practice-based learning). (Doc. 130 at 2). Dr. Thompson remained on "Concern Status" through April 2016, meaning there were "significant deficiencies . . . in [his] performance," which Dignity would try to "remediate" without reporting Dr. Thompson to the board or the Accreditation Council for Graduate Medical Education ("ACGME"). (Doc. 130 at 2).

Eventually though, on May 12, 2016, the Clinical Competency Committee decided again not to renew Dr. Thompson's contract. (Doc. 130 at 2). Program Director Dr. Suraj Muley and Associate Program Director Dr. Courtney Schusse notified Dr. Thompson of the non-renewal on May 31, 2016. (Doc. 130 at 3). On June 9, 2016, Dr. Thompson appealed the second non-renewal decision, asserting some attending physicians were biased against him, were "intent on exaggerating [his] shortcomings," and that one attending physician in particular made a "false" assertion about him.[1] (Doc. 130 at 3). But the appeal was denied as untimely. (Doc. 85 at 9). Dr. Thompson did not receive credit for the residency year. (Doc. 130 at 5). It is unclear precisely when Dr. Thompson stopped working at Dignity. (Docs. 130 at 3; 135 at 2). Regardless, the parties agree he was paid

---

[1] As will be relevant later, the allegedly biased attending physicians do not include Dr. Muley.

through June 30, 2016, the date his contract expired. (Docs. 130 at 3; 135 at 5).

After leaving Dignity, Dr. Thompson applied for a California medical license. (Doc. 130 at 3). In the application, he signed a declaration stating:

> I hereby authorize all hospitals, institutions or organizations, my references, personal physicians, employers (past, present, and future), or business and professional associates (past, present, and future) . . . to release to the Medical Board of California or its successors any information, files or records, including . . . educational records . . . requested by the Board in connection with this application.

(Doc. 130 at 3).

As requested by the Medical Board of California ("Board") and as was his duty as Program Director, Dr. Muley prepared and signed a Certificate of Completion ("Certificate") for Dr. Thompson on October 31, 2016. (Docs. 130 at 3; 135 at 5). Dr. Muley claims he never previously filled out a licensing form "in a problem situation." (Doc. 130 at 4). On the Certificate, Dr. Muley marked the box indicating Dr. Thompson had been placed on probation and "terminated, dismissed or expelled." (Doc. 130 at 3–4). Dr. Muley also marked a box to indicate "the program decline[d] to renew or offer the applicant postgraduate training program contract for a following year." (Doc. 85-1 at 230). Nearly eighteen months later and after this case was filed, on April 30, 2018, Dignity sent a new Certificate to the Board omitting any mention of probation or termination, but stating the following:

> Dr. Thompson began his second year of residency and first year of neurology training at Barrow Neurological Institute ("BNI") in Phoenix, Arizona on July 1, 2015. Dr. Thompson was placed on a Performance Improvement Plan effective March 22, 2016, which included a modified rotation schedule. On May 31, 2016, BNI informed Dr. Thompson that his residency contract would not be renewed. Dr. Thompson was paid for the remainder of the 2015-2016 academic year, but was not given credit for the 2015-2016 academic year.

(Doc. 135-1 at 14).

The parties view Dr. Muley's initial Certificate quite differently. Both Dignity and Dr. Muley consider nonrenewal to be synonymous with termination because residency is normally a three-year program. (Doc. 130 at 4). They also describe Dr. Thompson as

"terminated" because they allege he had to stop working on May 31, 2016.[2] And they consider the PIP as a form of probation. (Doc. 130 at 4).

On the contrary, Dr. Thompson submits Dr. Muley's two Resident Fellow/Action Forms ("Action Forms") from December 2015. Those forms had a list of escalating options to address performance deficiencies. The list consisted of Verbal Counseling, Written Action Plan, Concern Status, Recommend Probation, and Recommend Termination. In completing these two forms, Dr. Muley did not check the boxes indicating he was recommending probation or termination. (Doc. 135 at 3). In an "Action Plan" drafted in February 2016, Dr. Muley noted Dr. Thompson faced the possibility of "formal probation" and "termination" for further professional misconduct. (Doc. 93-1 at 45). On the March 2016 PIP, Dr. Muley again failed to check the boxes recommending probation or termination. (Doc. 135 at 3). Thus, Dr. Muley completed three forms explicitly stating probation and termination required approval by the Graduate Medical Education Committee and would have to be reported to the Arizona Medical Board. (Doc. 135 at 4). Dr. Muley also testified that recommending probation and termination were more severe than an action plan and that he knew approval from another official before placing a resident on probation was required. (Doc. 135-1 at 6). The emails, meeting minutes, and other documentary evidence surrounding Dr. Thompson's non-renewal make no reference to placing him on probation or termination. (Doc. 135 at 4–5). In fact, Dr. Muley wrote in an email, "[w]e should for sure let him finish his contract or at least pay him through June 30th." (Doc. 93-2 at 61).

On October 11, 2017, Dr. Thompson filed an amended complaint in this action, alleging racial discrimination in violation of Title VII and 42 U.S.C. § 1981, breach of contract, and defamation. (Doc. 29). On March 5, 2019, the Court granted summary judgment for Dignity on all claims. (Doc. 100). In granting summary judgment on Dr. Thompson's defamation claim, the Court held Dr. Muley's allegedly defamatory statements, that Dr. Thompson was placed on probation and termination, were

---

[2] As mentioned above, the precise date Dr. Thompson stopped working is disputed.

"substantially true," which is an absolute defense to defamation. (Doc. 100 at 17–19). However, on August 28, 2020, the Ninth Circuit reversed explaining "the meaning of [the relevant] terms," i.e., contract nonrenewal, termination, discipline, and probation, "may be subject to different interpretations," so "it was inappropriate . . . to resolve this question on a summary judgment motion." *Thompson v. Dignity Health*, 823 F. App'x 527, 531 (9th Cir. 2020) (citation omitted). Now, Dignity seeks summary judgment on defamation because it argues an absolute or qualified privilege applies and Dr. Thompson cannot prove defamation per se or economic damages.

## LEGAL STANDARD

The moving party is entitled to summary judgment if the evidence, viewed in the light most favorable to the non-moving party, shows "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004); *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998). At summary judgment, the court cannot weigh the evidence nor make credibility determinations. *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1035 (9th Cir. 2005). The moving party initially bears the burden of proving the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–25 (1986). To do so, "[t]he moving party must either produce evidence negating an essential element of the non-moving party's claim or defense or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the non-moving party to demonstrate the existence of a factual dispute that might affect the outcome of the suit. *Saddiq v. Trinity Servs. Grp.*, 198 F. Supp. 3d 1051, 1055 (D. Ariz. 2016). Non-movants "must show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in his favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in original) (citing *Anderson v. Liberty Lobby*, 447 U.S. 242, 257 (1986). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both

1  insufficient to withstand summary judgment." *Id.* (citing *Galen v. Cty. of Los Angeles*, 477
2  F.3d 652, 658 (9th Cir. 2007)).

3      Regarding the evidence, the district court "need consider only the cited materials."
4  Fed. R. Civ. P 56(c)(3). Thus, "where the evidence is not set forth in the opposing papers
5  with adequate references so that it could conveniently be found" "[t]he district court need
6  not examine the entire file for evidence establishing a genuine issue of fact." *Wyatt Tech.*
7  *Corp. v. Smithson*, 345 F. App'x 236, 239 (9th Cir. 2009) (quoting *Carmen v. San Fran.*
8  *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001)). That said, the district court may
9  consider materials in the record not cited by the parties. Fed. R. Civ. P 56(c)(3).

## DISCUSSION

11      Dignity seeks summary judgment on Dr. Thompson's defamation claim based on
12  an absolute privilege, a conditional privilege, the inapplicability of defamation per se, or
13  the unavailability of economic damages. (Doc. 129).

### I.    Privileges

15      The existence of a privilege in a defamation case is a question of law decided by the
16  Court. *Green Acres Trust v. London*, 141 Ariz. 609, 613 (Ariz. 1984). "To determine if a
17  privilege, absolute or qualified, exists, [Arizona courts] first examine the applicable case
18  law," but "[i]f no clear answer is obtained, then [Arizona courts] look to the Restatement
19  for guidance." *Burns v. Davis*, 196 Ariz. 155, 159 (Ct. App. 1999).

### A. Absolute Privilege of Consent

21      Dignity Health argues Dr. Thompson consented to the publication of the statements,
22  thus barring a defamation claim absolutely. (Doc. 129 at 3). Dignity argues Dr.
23  Thompson's authorization for hospitals "to release to the Medical Board of California or
24  its successors any information, files or records, including . . . educational records . . .
25  requested by the Board in connection with this application" constituted consent to Dr.
26  Muley's probation and termination statements. (Doc. 129 at 3–5).

27      "Consent is a complete defense to defamation." *Mullenaux v. Graham Cty.*, 207
28  Ariz. 1, 7 (Ct. App. 2004) (citation omitted). Consent requires the plaintiff at least "has

reason to know that [the consented-to statements] may be defamatory." Restatement (Second) of Torts § 583 cmt. d (1977). Essentially, for consent to apply, the plaintiff must be able to anticipate the defamatory statements.

The parties have not pointed to any helpful Arizona case law. However, a Northern District of Illinois court applied Arizona law in a strikingly similar situation. In *Chi v. Loyola University Medical Center*, the district court held a doctor consented to defamation by signing an authorization and release allowing his former employer to provide information to a new employer about his performance. No. 10 C 6292, 2013 WL 422868 (N.D. Ill. Feb. 1, 2013). In providing information to the new employer, the doctor's former program director stated that he could not recommend the doctor. *Id.* The district court applied section 583 of the Restatement to determine whether the doctor had reason to know his former program director's statements might be defamatory. *Id.* at *6. The court explained, the Restatement "does not appear to provide a privilege for defamatory statements that the plaintiff had no reason to anticipate." *Id.* at *7. But because the doctor had testified that his program director lied and held personal bias against him, the court held the doctor could anticipate the program director's statements might be defamatory and the consent privilege barred defamation.

The facts here differ. Dignity offers no evidence to show Dr. Thompson had reason to know Dr. Muley might make the express and explicit statements about probation and termination. Although Dr. Thompson previously alleged that some attending physicians harbored bias against him, exaggerated his shortcomings, and made a false assertion about him, those allegations did not involve actions by Dr. Muley. Moreover, those allegations were relevant to why Dr. Thompson received written discipline, was placed on a PIP, and that his contract was not renewed. But they were not relevant to whether Dr. Thompson was ever placed on probation or terminated.

Dignity argues the discipline, PIP, and nonrenewal were sufficient for Dr. Thompson to have reason to know Dr. Muley's statements might be defamatory. (Doc. 136 at 3–4). Of course, Dr. Thompson could anticipate that Dr. Muley would report the

- 7 -

discipline, PIP, and nonrenewal. But Dignity fails to explain why those true occurrences would require Dr. Thompson to anticipate that Dr. Muley would make every possible false statement. In short, Dr. Thompson had no reason to know Dr. Muley might say Dr. Thompson was placed on probation and terminated. As a result, Dr. Thompson did not consent, and Dignity's motion will be denied on this issue.

**B. Qualified Privileges**

Next, Dignity asserts a qualified privilege, either the "protection of interest of recipient privilege," which protects disclosures of information that affect a sufficiently important interest of the recipient, or the "common interest privilege," which protects disclosures of information that another party with a common interest is entitled to know, applies. Restatement (Second) of Torts §§ 595, 596 (1977). "In general, Arizona law establishes a two-part analysis for determining whether a qualified privilege exists." *Green Acres Tr. v. London*, 141 Ariz. 609, 616 (1984). "The court must first determine whether a privileged occasion arose, and, if so, whether the occasion for the privilege was abused." *Id.* (citation omitted). "Whether a privileged occasion arose is a question of law for the court, and whether the occasion for the privilege was abused is a question of fact for the jury." *Id.* (citation omitted).

Dr. Thompson concedes at least one of the qualified privileges apply. (Doc. 134 at 9). However, he argues a material dispute of fact exists as to whether the privilege was abused. "Once a defendant demonstrates that a conditional privilege may apply, the plaintiff may then prove an abuse of that privilege either by proving publication with 'actual malice' or by demonstrating excessive publication." *Green Acres Tr.*, 141 Ariz. at 616 (citation omitted). "An abuse through actual malice occurs when the speaker makes a statement knowing it is false or with reckless disregard of whether it is false."[3] *Burns v. Davis*, 196 Ariz. 155, 164 (Ct. App. 1999) (citation omitted). The plaintiff must prove actual malice by clear and convincing evidence. *Selby v. Savard*, 134 Ariz. 222, 225 (1982)

---

[3] "Reckless disregard as to truth or falsity exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement." Restatement (Second) of Torts § 600, comment b (1977).

- 8 -

(citation omitted). "[T]he proof of 'actual malice' calls a defendant's state of mind into question, and does not readily lend itself to summary disposition." *Id.* (citation omitted). Nor is the fact that a defendant has alleged "subjective belief in the truth of the matter published" sufficient to escape liability, because "proof of the necessary state of mind could be in the form of objective circumstances from which the ultimate fact could be inferred." *Id.* (citation omitted).

Here, Dr. Thompson argues Dr. Muley's statements were made with actual malice. Viewing the evidence in the light most favorable to Dr. Thompson, a material dispute of fact exists as to whether Dr. Muley had actual malice. Dr. Muley filled out several Action Forms and the PIP without checking the boxes that recommended probation or termination. (Doc. 135 at 3). On one of the Action Forms, Dr. Muley explicitly raised the possibility of imposing "formal probation" and "termination" in the future. (Doc. 93-1 at 45). Dr. Muley also testified that he knew probation and termination were more severe than an action plan and probation required approval from the DIO. (Doc. 135-1 at 6). Both probation and termination decisions required reporting to the Arizona Medical Board. (Doc. 135 at 4). Dr. Muley did not request approval from the DIO or make any such reports to the Arizona Medical Board. At the end of Dr. Thompson's employment, Dr. Muley decided Dr. Thompson should be allowed to finish his contract or at least be paid through the end of it. (Doc. 93-2 at 61). Moreover, on the Certificate, Dr. Muley marked boxes indicating Dr. Thompson was subject to discipline and that his contract had not been renewed. (Doc. 85-1 at 230). Having marked those boxes, Dr. Muley additionally indicated Dr. Thompson had been placed on probation and terminated. (Doc. 85-1 at 230).

Essentially, the evidence could establish that probation and termination are terms of art in the medical community with very specific meanings distinct from other forms of discipline and contract nonrenewal. If a jury makes that inference, the evidence may be sufficient to show Dr. Muley knew Dr. Thompson was not subject to probation and termination. Thus, drawing all inferences in Dr. Thompson's favor, the undisputed, circumstantial evidence could create an inference that Dr. Muley either knew the

statements' falsity or acted with reckless disregard of whether they were false. A reasonable jury could find, by clear and convincing evidence, Dr. Muley abused the qualified privilege by publication with actual malice.

Dignity, however, argues Dr. Thompson cannot establish actual malice. In support, Dignity provides evidence that Dr. Muley honestly believed the probation and termination statements were true. But the Arizona Supreme Court has held, subjective belief in the truth of the matter published may not be sufficient to escape liability as objective circumstantial evidence can prove actual malice. *Selby*, 134 Ariz. at 225. This is a jury question in this particular case. Moreover, the Arizona Supreme Court has been clear that abuse of a qualified privilege can rarely be resolved at summary judgment. *Id.* Accordingly, there is a material dispute as to whether Dr. Muley abused the qualified privilege, and the motion will be denied on this issue.

## II.     Economic Damages

Finally, Dignity seeks summary judgment on Dr. Thompson's defamation per se claim and the availability of economic damages. Both arguments are raised for the first time on summary judgment.

Dignity first argues the probation and termination statements cannot, as a matter of law, constitute defamation per se.

According to Arizona law, libel, the written form of defamation, is classified as either per se or per quod. *Boswell v. Phoenix Newspapers*, 152 Ariz. 1, 6 n.4 (Ct. App. 1985), *approved as supplemented*, 152 Ariz. 9 (1986). A communication is libel per se if on its face it tends "to impeach one's honesty, integrity, or reputation." *Id.* If a communication "is libelous only by considering extrinsic information, then it is considered libel per quod." *Id.* Libel per quod requires a plaintiff plead pecuniary damages, while libel per se does not. *Id.*

Here, Dr. Muley specifically stated that Dr. Thompson was "terminated, dismissed, or expelled" and "placed on probation." (Doc. 85-1 at 230–31). Dignity argues these statements require extrinsic information before impeaching Dr. Thompson's honesty,

integrity, or reputation. The Court disagrees. It is common sense that a statement that a medical resident was placed on probation and terminated, dismissed, or expelled goes directly to that resident's reputation. Accordingly, the statements may constitute defamation per se.

Because defamation per se does not require evidence of pecuniary damages, the Court need not address Dignity's argument about the availability of economic damages, and the motion will be denied on this issue.

Accordingly,

**IT IS ORDERED** the motion for summary judgment (Doc. 129) is **DENIED**.

**IT IS FURTHER ORDERED** all Motions in Limine are due **December 6, 2021**. Responses are due ten days afterward. No replies are permitted unless ordered by the Court. Prior to filing any Motion in Limine, the parties must confer and discuss the contents of each planned motion. No Motion in Limine should be filed if the other party does not oppose the relief requested.

**IT IS FURTHER ORDERED** the Joint Proposed Pretrial Order, if not already filed, is due **December 13, 2021**.

**IT IS FURTHER ORDERED** the parties shall review the Court's standard Juror Questionnaire (available on the Court's website) and file **NO MORE THAN FIVE STANDARD PROPOSED QUESTIONS EACH** to be added to the standard Juror Questionnaire with the Court's approval no later than **December 13, 2021**. Each proposed question shall stand alone and shall not contain sub-parts.

**IT IS FURTHER ORDERED** the parties shall file a Joint Statement of the Case, of no more than a few short sentences for the Juror Questionnaire, no later than **December 13, 2021**.

**IT IS FURTHER ORDERED** the parties shall file a second Joint Statement of the Case, of no more than two short paragraphs to be read to the jury, no later than **January 10, 2022**.

**IT IS FURTHER ORDERED** no later than **January 10, 2022**, the parties shall

file and submit via email (silver_chambers@azd.uscourts.gov) in Word format proposed Jury Instructions in compliance with the procedures available on the Court's website, including but not limited to: 1) a *joint* set of proposed jury instructions where the parties' instructions agree; 2) a separate set of instructions (one for each party) where the parties do not agree; and 3) legal authority supporting all proposed instructions whether the parties agree or not. Where the parties do not agree, the opposing party shall clearly state its objection to the proposed instruction and the proposing party shall clearly state its response.

**IT IS FURTHER ORDERED** the parties shall jointly file a proposed form of verdict, or if the parties do not agree, they may separately file proposed forms of verdict no later than **January 10, 2022**.

**IT IS FURTHER ORDERED** no later than **January 10, 2022**, the parties shall deliver to chambers excerpts of the deposition testimony they propose to present at trial, in compliance with the procedures available on the Court's website (found in Deposition Designation Procedure for Judge Silver), including but not limited to: Plaintiffs highlighting in yellow the portions they wish to offer and Defendants highlighting in blue those portions they wish to offer. If either party objects to the proposed testimony, a specific and concise objection (e.g., "Relevance, Rule 402") shall be placed in the margin adjacent to the proposed testimony.

**IT IS FURTHER ORDERED** a final pretrial conference is set for **February 8, 2022 at 10 a.m.**, at which time the Court will review Juror Questionnaires. The parties shall meet and confer prior to this date regarding the Juror Questionnaires and email to the Courtroom Deputy no later than **noon on February 7, 2022** a list of any jurors they agree should be stricken for cause, along with any objections to jurors they do not agree should be stricken for cause. **The parties shall not file this list.** The Court will rule on any disputed jurors at the final pretrial conference.

**The parties will be supplied a disk containing the questionnaires approximately one week prior to the final pretrial conference. Counsel shall bring a copy of the questionnaires to the conference for review. Counsel are required to return the disk**

**to the Courtroom Deputy and destroy all copies of the questionnaires no later than the last day of trial.**

**IT IS FURTHER ORDERED** trial to a jury is set for **February 15, 2022 at 8:30 a.m.** Estimated length of trial is 3 days.

**IT IS FURTHER ORDERED** the parties shall comply with the Exhibit Procedures found on the Court's website at www.azd.uscourts.gov / Judges' Information / Orders, Forms & Procedures for Hon. Roslyn O. Silver.

Dated this 5th day of August, 2021.

Honorable Roslyn O. Silver
Senior United States District Judge